## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| TIMOTHY ROSIN,<br><br>        Plaintiff,<br><br>    v.<br><br>BOARD OF EDUCATION OF CHARLES<br>COUNTY,<br>KIMBERLY HILL, *in her personal capacity*,<br>and<br>AMY HOLLSTEIN, *in her personal capacity*,<br><br>        Defendants. | Civil Action No. TDC-21-0983 |

## MEMORANDUM OPINION

Plaintiff Timothy Rosin, a 59-year-old man currently employed by the Charles County Public Schools in Charles County, Maryland as a special education teacher at the F.B. Gwynn Educational Center, has filed suit against the Board of Education of Charles County ("the Board"); Kimberly Hill, Superintendent of the Charles County Public Schools ("CCPS"); and Amy Hollstein, Deputy Superintendent of CCPS, alleging due process violations and age discrimination under 42 U.S.C. § 1983 ("§ 1983") and state law claims of defamation and breach of contract based on his 2019 demotion from Vice Principal to classroom teacher in the wake of an October 29, 2019 playground incident at Gale-Bailey Elementary School in Charles County ("the October 29, 2019 Incident") and based on a prior demotion from Principal to Vice Principal in 2018 at a different CCPS school. Defendants have filed a Motion to Dismiss, which is now ripe for resolution. Having reviewed the briefs and submitted materials relating to the Motion, the Court finds no

hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

**I.     October 29, 2019 Incident**

On October 29, 2019 between 2:15 p.m. and 2:45 p.m., a number of fourth grade students at Gale-Bailey Elementary School ("Gale-Bailey") in Charles County, Maryland were playing a game of "monster tag" on the school playground. Compl. ¶¶ 19–27, ECF No. 1. At some point during the game, one of the boys approached three of the girls, stated an interest in having sex with them using graphic language, and grabbed the hand of one of the girls. Two other boys stood nearby during the incident. All six of the students were about 10 years old at the time. The girls told the teachers supervising the playground about the incident, and at about 3:00 p.m., the three girls were sent to report it to Rosin, who was in charge of disciplinary matters. The Principal of Gale-Bailey, Verniece Rorie, was on sick leave that day and thus was not present.

CCPS had no written procedure for handling sexual incidents like the one on the playground, nor had CCPS provided staff with training on how to address such issues. Rosin initiated an investigation by instructing the three girls to each complete an Incident Statement Sheet ("Incident Sheet"). He then summoned to his office the three boys who had been present for the incident and directed them to complete Incident Sheets. By 4:00 p.m., the end of the school day, the girls had not completed their Incident Sheets, but Rosin dismissed them to ensure that they would not miss the school buses taking them home and instructed them to return to his office the next day to complete their Incident Sheets. Rosin instructed the students to inform their parents of the incident and separately made phone calls to the parents and spoke to or left messages for them. At some point that day or the next, Rosin discussed the incident with Rorie.

2

The following day, October 30, 2019, the three girls returned to school to complete their Incident Sheets but then left the school because their parents had decided that their children would not return to Gale-Bailey. The same day, Officers Eugene Caballero and James Plunkett, who were school resource officers employed by the Charles County Sheriff's Office, arrived at Gale-Bailey to conduct an investigation of the incident, which included assessing whether criminal charges should be brought against the boys. In accordance with protocol, Rosin did not take any disciplinary action while the investigation was ongoing.

Also on October 30, Rorie returned to Gale-Bailey from sick leave and contacted CCPS Executive Director of School Administration Linda Gill for instructions on how to proceed. Gill directed Rorie to contact CCPS Title IX Coordinator Kathy Kiessling to inform her of the incident, to contact the parents of the three boys to inform them that the students could face disciplinary action following the investigation, and to consider suspending the boys and moving them to another class. Rorie shared Gill's instructions with Rosin, and each proceeded to follow them. When Rorie later spoke to Kiessling, Kiessling reiterated Gill's suggestion that all three boys be suspended, and Rorie inquired as to the possibility of transferring the boy who had made sexually explicit comments to another school.

On November 1, 2019, Officers Caballero and Plunkett concluded their investigation and told Rorie that the boy who had made the sexual comments would be charged as a juvenile with fourth-degree sexual assault and second-degree assault. He was transferred to another school and never returned to Gale-Bailey. Consistent with Kiessling's recommendation that the boys be suspended, the other two boys received and served three-day suspensions, then returned to school. Rorie was the school official who notified the boys of their suspensions.

3

The decision to charge one of the boys with a criminal offense was controversial and became a topic of discussion and rumor on social media. In the wake of the incident, more than 50 parents contacted Rorie seeking information about what had occurred. CCPS, citing the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g (2018), tightly restricted what Rorie and Rosin were allowed to say about the incident, even to the parents of the students involved, and Deputy Superintendent Hollstein refused to allow Rorie to send a letter to all Gale-Bailey parents informing them of the incident.

On November 11, 2019, Rorie and Rosin met with Superintendent Hill, Hollstein, and Gill to discuss the October 29, 2019 incident. According to Rosin, Hill made unfounded accusations that he had mishandled the incident. On November 13, 2019, Rorie submitted an Incident Report about the October 29, 2019 Incident and its aftermath, and that same day CCPS issued its first public statement about the incident. With the ensuing media coverage, which included reporting that the parents of the girls were upset that two of the boys were permitted to return to Gale-Bailey, some parents began demanding that Rorie and Rosin be removed from their positions and that Hill resign.

On November 15, 2019, Rosin received a letter from CCPS Human Resources Director Nikial Majors stating that effective immediately, Rosin was placed on administrative leave with pay, was transferred from Gale-Bailey to the CCPS central office, and was prohibited from visiting Gale-Bailey or any other CCPS property without prior approval from the Superintendent or her designee.

In the November 22, 2019 edition of the Southern Maryland Chronicle, an online news publication, CCPS Communications Director Katie O'Malley-Simpson stated, "This is not the way this type of case should be handled and the individuals involved in making that decision are being

4

retrained in the proper procedures and responses." Compl. ¶ 117. On November 24, 2019, during an interview on local television station Fox 8, Hill stated, "I apologize to you for what happened to your daughter and any other child in this situation because it shouldn't happen" and promised that staff members at Gale-Bailey would be retrained. *Id.* ¶ 121. Rosin asserts that despite these statements, neither he nor Rorie ever received any retraining.

Meanwhile, the parents of the three girls involved in the incident retained an attorney who held a press conference on November 25, 2019 and threatened to file a complaint against CCPS with the United States Department of Justice, Civil Rights Division. That same day, Rosin was suspended for five days without pay and reassigned to be the Vice Principal at Billingsley Elementary School ("Billingsley"), effective December 2, 2019. To explain the decision, Hill sent Rosin a letter stating that while in charge at Gale-Bailey on October 29, 2019, he had not followed "county procedures regarding a suspected sexual assault on the playground," and that his failure to do so "constituted misconduct in office" and "willful neglect of duty." *Id.* ¶ 128. That letter informed Rosin that he would be receiving "notice from the Board" about his rights, "including a right to a hearing" on the issue of the suspension. *Id.* ¶ 130.

On November 26, 2019, Hollstein removed Rorie from her post at Gale-Bailey, demoted her to Vice Principal, reassigned her to another school, and suspended her without pay for five days. Hollstein's cited reasons for these actions included the school community's loss of confidence in Rorie. On November 26, 2019, CCPS issued a press release stating that both Rorie and Rosin had been removed from their positions at Gale-Bailey.

On December 11, 2019, only nine days after Rosin was transferred to Billingsley to serve as Vice Principal, he was demoted from Vice Principal to classroom teacher, a demotion that reduced his salary by approximately $32,000. After demands by Rosin's union representative, the

demotion was memorialized in a December 12, 2019 letter from Hill that was personally delivered by Hollstein. The December 12 letter stated in part, "If you would like to appeal this reassignment, please send your written appeal to Virginia McGraw, Chairman, Board of Education of Charles County" within 30 days of the date of the letter. *Id.* ¶ 143.

That same day, Rosin received by email a "Litigation Hold Letter" from CCPS Staff Attorney Eric Schwartz. *Id.* ¶ 144. The letter stated:

> Please note that any communication, including emails, text messages, and telephone conversations, that are not directed to [CCPS] Board legal counsel, but that discuss the matter may be discoverable and may have to be produced/disclosed in the anticipated litigation. Accordingly, you are instructed not to discuss this case with anyone other than me or the Board's counsel.

*Id.* ¶ 146. The Litigation Hold Letter asked Rosin to confirm receipt, which he did by return email and also through a phone call with Schwartz. Rosin asserts that, in compliance with the Litigation Hold Letter, he spoke with no one about his suspension or demotion, nor did he appeal his suspension or demotion within the 30-day window.

**II.     May 7, 2018 Demotion**

On May 7, 2018, while Rosin was serving as the Principal of Indian Head Elementary School ("Indian Head"), another CCPS school, he received a letter from Superintendent Hill demoting and reassigning him to the position of Vice Principal at Gale-Bailey, effective at the beginning of the 2018-2019 school year. The letter gave as the reason for the demotion only that Rosin's demotion and reassignment were "in the best interests of the school system." *Id.* ¶ 156. The letter did not inform Rosin of any procedure for filing an appeal of his demotion and reassignment. Prior to this demotion, Rosin had consistently been rated as "effective" or higher in his performance evaluations. *Id.* ¶ 158. At the time of Rosin's demotion, he was approximately

6

56 or 57 years old and was replaced as Principal of Indian Head by a woman who was approximately 45 or 46 years old and who had no prior experience as a Principal.

## III.    Procedural History

On April 21, 2021, Rosin filed the Complaint in this case in which he asserts seven causes of action, numbered as follows: (1) a § 1983 due process claim against Hill based on his demotion from Vice Principal to classroom teacher following the October 29, 2019 Incident at Gale-Bailey ("the Gale-Bailey demotion"); (2) a § 1983 due process claim against Hollstein based on the Gale-Bailey demotion; (3) a § 1983 due process claim against Hill based on his 2018 demotion from Principal of Indian Head to Vice Principal ("the Indian Head demotion"); (4) a § 1983 age discrimination claim against Hill based on the Indian Head demotion; (5) a state law defamation claim against Hill based on the public statements made after the October 29, 2019 Incident; (6) a state law defamation claim against the Board based on the same statements; and (7) a state law breach of contract claim against the Board relating to the Gale-Bailey demotion. Defendants have filed a Motion to Dismiss all of Rosin's claims. In his memorandum in opposition to the Motion, Rosin concedes that his defamation claims in Counts 5 and 6 are time-barred and thus must be dismissed, so the Motion will be granted as to those two causes of action. The Court will therefore address Defendants' arguments for dismissal of Counts 1-4 and 7.

## DISCUSSION

In the Motion, Superintendent Hill and Deputy Superintendent Hollstein seek dismissal of Rosin's § 1983 claims against them on the grounds that they are not subject to a § 1983 claim because at all relevant times they were acting in their official capacities or, alternatively, they are entitled to qualified immunity. As to Rosin's breach of contract claim, Defendants argue that it

fails because Rosin was required, but failed, to raise his grievances through a mandatory administrative appeals process.

## I.        Legal Standard

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*   Legal conclusions or conclusory statements do not suffice. *Id.*  The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

## II.       42 U.S.C. § 1983

Section 1983 permits the filing of a civil action against a "person" acting under color of state law who causes a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983 (2018).  In his Complaint, Rosin alleges claims against Superintendent Hill and Deputy Superintendent Hollstein in their personal capacities under § 1983 for due process violations under the Fourteenth Amendment to the United States Constitution (Counts 1, 2, and 3) and against Superintendent Hill in her personal capacity for age discrimination (Count 4) under the Equal Protection Clause of the Fourteenth Amendment. Although Defendants generally state that they are seeking dismissal of these counts, they offer no specific argument for dismissal.  Their argument therefore appears to be confined to their general claim that Hill and Hollstein are either not properly subject to suit or entitled to qualified immunity on all § 1983 claims.

## A.    Official Capacity

As a threshold matter, Defendants argue that the § 1983 claims against Hill and Hollstein must be dismissed because, although asserted against them in their personal capacities, those claims in fact relate to actions those Defendants took in their official capacities.  In turn, claims against state officials in their official capacities are effectively claims against the state and are thus not proper claims against a "person," as required for a § 1983 claim.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983.").

The Court finds Defendants' argument unpersuasive.  Distinctions in § 1983 claims between official capacity and personal capacity suits are "best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury."  *See Hafer v. Melo*, 502 U.S. 21, 26 (1991) (rejecting the argument that a state agent may not be sued in the agent's personal capacity under § 1983 for actions taken within the agent's authority).  The United States Supreme Court has expressly rejected the proposition Defendants advance here, that acts taken pursuant to a state official's authority cannot give rise to an personal-capacity action, finding that such an argument "finds no support in the broad language of § 1983" and "ignores" Supreme Court precedent holding that § 1983 was enacted "'to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it.'"  *Id.* at 28 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 243 (1974)).

Defendants' cited authority does not lead to a contrary conclusion.  In particular, *Biggs v. Meadows*, 66 F.3d 56 (4th Cir. 1995), the only controlling authority offered by Defendants, did not hold that acts taken as part of a state actor's official duties cannot give rise to a personal-

capacity action, but instead set forth a test to determine whether, when a complaint does not specify in which capacity a state actor is sued, the state actor should be construed as sued in an official or personal capacity. *Id.* at 58, 61. Here, Rosin has sued Hill and Hollstein in their personal capacities, so the problem solved by *Biggs* is not presented here. Hill and Hollstein are thus properly subject to suit in their personal capacities for actions taken in the course of their duties.

### B.    Age Discrimination

Rosin's § 1983 age discrimination claim against Hill in her personal capacity must be dismissed because the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621-634 (2018), "provides the exclusive judicial remedy for claims of age discrimination." *Zombro v. Balt. City Police Dep't*, 868 F.2d 1364, 1369 (4th Cir. 1989) (holding that the ADEA "foreclose[d] age discrimination suits under § 1983"). The Motion will therefore be granted as to Count 4.

### C.    Due Process

Hill and Hollstein argue that to the extent they can be sued under § 1983 in their personal capacities, they are entitled to qualified immunity on Rosin's § 1983 claims. Government officials sued in their personal capacities may invoke the protection of qualified immunity to bar a claim for civil damages under § 1983. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Henry v. Purnell*, 501 F.3d 374, 376-77 (4th Cir. 2007). When qualified immunity is asserted, a court must consider two questions: (1) whether the facts, viewed in the light most favorable to the plaintiff, show that the official violated a constitutional right; and (2) "whether the right was clearly established," that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Henry*, 501 F.3d at 377. For qualified immunity to apply, only one of the questions has to be resolved in favor of the defendant. *See*

*Henry*, 501 F.3d at 377. Courts may address the questions in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Rosin's remaining § 1983 claims all assert due process violations based on alleged deficiencies in the notice provided about, or his ability to pursue, his right to appeal his 2018 and 2019 demotions and suspensions. Because each of the remaining claims involves the Fourteenth Amendment right to due process, the Court turns first to whether the right at issue in these claims was clearly established at the time of the alleged deprivation.

### 1.    **Clearly Established Right**

Whether a right was "clearly established" turns on whether "the contours of the right [were] sufficiently clear that a reasonable official would understand that what [the official] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In assessing this question, a court generally considers whether the right is found in "cases of controlling authority in [this] jurisdiction"—here, the Supreme Court, the United States Court of Appeals for the Fourth Circuit, and the Court of Appeals of Maryland—but it may also consider "a consensus of cases of persuasive authority from other jurisdictions" as a basis to find that the conduct was barred by clearly established law. *Booker v. S.C. Dep't of Corrs.*, 855 F.3d 533, 538-39 (4th Cir. 2017) (citations omitted). A court seeks to identify a case in which a government official "acting under similar circumstances ... was held to have violated" the right. *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *see Safar v. Tingle*, 859 F.3d 241, 246 (4th Cir. 2017). Although the facts of such a case need not be "identical" to the present facts, *Safar*, 859 F.3d at 248, it should be "obvious" that the case applies to the facts, *White*, 137 S. Ct. at 552. Even if no court has found that the specific conduct in question violated an individual's rights, "if a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question,"

11

the right may be clearly established. *E.W. ex rel. T.W. v. Dolgos*, 884 F.3d 172, 185 (4th Cir. 2018).

Determining whether a plaintiff's procedural due process rights have been violated is a two-step process. First, the court must determine "[w]hether any procedural protections are due" by deciding whether a "liberty or property" interest within the meaning of the Fourteenth Amendment's Due Process Clause is at stake. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Second, should the Due Process Clause attach, the court determines "what process is due," keeping in mind that "due process is flexible and calls for such procedural protections as the particular situation demands." *Id.*

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972). "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support [a] claim of entitlement to the benefit." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972). A property interest in public employment can be created by state statute, local ordinance, or contract. *Bishop v. Wood*, 426 U.S. 341, 344 (1976); *Roth*, 408 U.S. at 576–77. The Supreme Court has found that the imposition of discipline against a public employee in violation of such procedures, including procedures that require that the employee have an opportunity to respond, can constitute a violation of procedural due process rights. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 547–48 (1985) (holding that an Ohio statute that entitled civil service employees to retain their positions unless there was cause for dismissal and set forth certain disciplinary procedures including an opportunity to respond "plainly creates" a property interest, and thus the plaintiff's allegation that he was deprived of a statutorily required chance to respond adequately stated a

Fourteenth Amendment due process claim). The Fourth Circuit has likewise found that a public employee with a statutory right to be terminated or suspended only for cause has, as a matter of due process, a right to notice and "some kind of a hearing" before such action is taken. *See Garraghty v. Jordan*, 830 F.2d 1299, 1299 (4th Cir. 1987). The right at issue was therefore clearly established at the time of Rosin's 2018 demotion and his 2019 demotion and suspension.

Further, at those times and through the present, Maryland law expressly adopted procedures to govern the suspension or dismissal of a public school employee, including a "teacher, principal, supervisor, assistant superintendent, or other professional assistant," by the relevant county board of education "on the recommendation of the county superintendent." Md. Code Ann., Educ. § 6-202(a)(1)(i)–(v) (LexisNexis 2018). The applicable statutory scheme states that employees may be disciplined for "[i]mmorality," "[m]isconduct in office," "[i]nsubordination," "[i]ncompetency," or "[w]illful neglect of duty." *Id.* Before such an employee may be removed from a position for such a reason, "the county board of education shall send the individual a copy of the charges against the individual" and give the individual an opportunity to request a hearing. *Id.* § 6-202(a)(2)(i). Based on this statutory scheme, at the time of the 2018 and 2019 demotions, it was clearly established that Rosin had a protectable due process property right relating to his removals from the positions of Principal and Vice Principal, namely the process set forth in section 6-202. *Loudermill*, 470 U.S. at 547–48; *Anderson,* 483 U.S. at 640.

### 2.     The Gale-Bailey Demotion

Turning to whether Rosin has alleged sufficient facts to state a plausible violation of his due process rights, in Counts 1 and 2, Rosin alleges § 1983 claims against Hill and Hollstein in their personal capacities on the grounds that the Litigation Hold Letter, with its instruction that Rosin not communicate about the events at Gale-Bailey with anyone other than Schwartz or

counsel for the Board, effectively deprived him of a due process right to appeal his demotion. The Court finds that Rosin fails to state a plausible due process violation by Hill or Hollstein on this basis.

The crux of Rosin's due process argument is the contention that the Litigation Hold Letter essentially enjoined Rosin from filing an appeal. Rosin's own allegations in the Complaint undercut this theory. First, the Litigation Hold Letter, on its face, did not bar Rosin from filing an appeal of his demotion and suspension, and its only prohibition was that CCPS "not discuss this case with anyone" other than the Board's counsel. Compl. ¶ 146. This instruction barring discussions cannot reasonably be read to bar the exercise of personnel rights such as filing a formal appeal of a demotion because, as set forth in the letter to Rosin regarding his appeal rights, such an appeal needed to be filed with "Virginia McGraw, Chairman, Board of Education of Charles County," rather than the Board's counsel. Compl. ¶ 143. Even if Rosin's reading were plausible, the Litigation Hold Letter did not bar any and all communication relating to the October 29, 2019 Incident but instead directed the flow of that communication through the Board's counsel. Where the appeal was to be filed with the Board Chairman, Rosin cannot plausibly argue that sending a notice of appeal to the Board's counsel, who would be a representative of the Board Chairman on official matters, would have been an ineffective means of preserving his rights. Where Rosin's argument relies on a hypertechnical reading of the two letters at issue and remarkably fine distinctions between Board counsel and the Board itself, the Court finds implausible Rosin's attempt to cast the Litigation Hold Letter as, functionally, a bar to his ability to pursue an appeal and thus a violation of his due process rights. *See Iqbal*, 556 U.S. at 679 ("[D]etermining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense." (citation omitted)).

Second, even if the Court were to accept that the Litigation Hold Letter could plausibly be viewed as barring Rosin from pursuing an appeal of the personnel actions against him, Rosin's § 1983 due process claims under this theory have been asserted against Hill and Hollstein in their personal capacities. The governing statutory duties give a role to the superintendent in the dismissal and suspension process, which includes various notice requirements. *See* Md. Code Ann., Educ. § 6-202(a)(1), (a)(2)(i) (stating that the county board's decision to suspend, dismiss, or remove an individual is to be taken "on the recommendation of the county superintendent" and requiring the "county board" to provide the required notice of disciplinary action and the right to appeal). The statute, however, confers no power or duties on a deputy superintendent in the disciplinary process. *See id.* Based on this statutory scheme, Hollstein had no due process obligations to Rosin relating to the personnel actions against him, so Rosin has no viable due process claims against her.

As for Hill, Rosin's own allegations establish that he received notice of his appeal rights as to his 2019 demotion and suspension. Under his theory, the due process violation arises from the issuance of the Litigation Hold Letter by Schwartz. Rosin does not specifically allege, and does provide facts sufficient to support the conclusion, that Hill directed Schwartz to issue the Litigation Hold Letter or even that she generally has a formal role in the issuance of such letters. Where the alleged denial of due process is rooted in the instructions of the Litigation Hold Letter but Rosin's allegations provide no basis to impute the Litigation Hold Letter to Hill or Hollstein, the due process claims against Hill and Hollstein based on the Gale-Bailey demotion cannot succeed.

Perhaps recognizing the insufficiency of his pleading on these counts, in his memorandum in opposition to the Motion ("Opposition"), Rosin offers the new allegation that Hill and Hollstein

15

violated his due process rights by demoting and suspending him without first obtaining the statutorily required confirmation of the Board. However, "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Mylan Labs., Inc. v. Akzo*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)), *aff'd*, 2 F.3d 56 (4th Cir. 1993); *see also Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998). This principle is particularly applicable here because through a pre-motion filing and at a Case Management Conference, Rosin was apprised of Defendants' proposed arguments for dismissal and, although expressly offered the opportunity to amend his Complaint, chose not to do so, either before the filing of the Motion to Dismiss or in response to the Motion, as permitted under Federal Rule of Civil Procedure 15(a)(1)(B).

For the same reasons, the Court finds that Rosin's statement in the Opposition, for the first time, that "the harm done to Mr. Rosin's reputation will be pursued through 42 U.S.C. § 1983 as "stigma-plus" claims, Opp'n at 18, ECF No. 12, constitutes an improper attempt to amend the Complaint through a motion brief and thus does not provide a basis to preclude dismissal of the § 1983 due process claims against Hill and Hollstein.

Defendants' Motion will therefore be granted as to Counts 1 and 2 on the basis of qualified immunity. As Count 2 is the only count alleged against Deputy Superintendent Hollstein, she will be dismissed as a Defendant.

### 3.    The Indian Head Demotion

Rosin's remaining § 1983 due process claim is his claim in Count 3 against Hill in her personal capacity based on the 2018 Indian Head demotion. Rosin alleges that he was removed

16

from his position as Principal and demoted to the position of Vice Principal without having been given specific reasons for the demotion and without receiving notice of the applicable procedure to appeal the demotion. As discussed above, Maryland state law identifies specific conduct that can support a disciplinary charge and sets forth specific disciplinary procedures that include sending a copy of the charges to the individual. *See* Md. Code Ann., Educ. § 6-202(a)(1)(i)–(v), (a)(2)(i). Where Rosin has alleged that he was demoted from Principal to Vice Principal without receiving the required notice of the statutorily delineated charges underlying the personnel action, the Court finds that, at this stage, he has sufficiently alleged a violation of a protected property interest in his position as Principal for purposes of a Fourteenth Amendment due process claim. *See Loudermill*, 470 U.S. at 547–48; *Underwood v. Bd. of Cnty. Sch. Comm'rs of Prince George's Cnty.*, 63 A. 221, 223 (Md. 1906) (holding that where a statute provided that "teachers may be removed at any time" after 30 days' notice in writing, but that the school board "shall furnish, in writing, when required by the teacher so notified, the reasons for dismissal," letters notifying a teacher only that the trustees believed it to be in the best interests of the school that her services be dispensed with and disclosing no other reasons for her dismissal were insufficient to satisfy the statutory requirements). *Cf. Bd. of Sch. Comm'rs of Balt. City v. James*, 625 A.2d 361, 374–76 (Md. Ct. Spec. App. 1993) (finding that the teacher-plaintiffs had received adequate notice prior to termination where they received a formal written Statement of Charges citing "incompetency" as a basis for termination and where they had each previously received "needs improvement" evaluations and distinguishing such a situation from when a teacher is given "*no* notice of the reason for her dismissal" and instead is simply notified that her "'services' are no longer 'required'" (citing *Underwood*, 63 A. at 223)).

17

However, to the extent Rosin's Indian Head demotion due process claim is based on a failure to notify him of his right to appeal, the claim fails. Due process in this context requires only a pre-termination "initial check against mistaken decisions," which amounts only to "oral or written notice of the charges ... an explanation of the employer's evidence," and "an opportunity" for the employee to present his or her "side of the story." *Loudermill*, 470 U.S. at 546; *see Heflin v. Ulman*, No. 0156 Sept Term. 2015, 2016 WL 1360805, at *2 (Md. Ct. Spec. App. Apr. 6, 2016) (in a case involving a dismissed county employee, rejecting the plaintiff's argument that a lack of notice of his right to appeal amounted to a due process violation even where the relevant county statute required such notice (citing *Loudermill*)). Nor does the governing statute create a different mandate. While the statute states that an "individual may appeal from the decision of the county board to the State Board," it nowhere requires notice of that right, in contrast to the express statutory language requiring pre-termination notice of the charges and of the right to a hearing before the county board. *Compare* Md. Code Ann., Educ. § 6-202(a)(4) (allowing for an appeal to the State Board of Education) *with* § 6-202(a)(2)(i) (requiring notice of the charges and the right to request a hearing before removal).

Here again, Rosin tries to amend his allegations through his briefing. First, he recharacterizes his claim that he was not notified of his right to appeal as a claim that he never received notice of his right to request a hearing. Second, as with his Gale-Bailey due process claims, he offers the entirely new argument that his due process rights were violated because his Indian Head demotion was not presented to and approved by the county board. For the reasons stated above, the Court does not consider these newfound allegations but instead holds Rosin to the allegations in his Complaint. *See supra* part II.C.2.

18

Defendants' Motion will therefore be denied as to Count 3, but that claim may proceed based only on the alleged failure to provide Rosin with a reason for his demotion, not based on the alleged failure to notify him of his right to appeal that demotion.

## III.    Breach of Contract

Rosin also asserts a breach of contract claim.  In Maryland, "to prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001).

Here, Rosin does not identify any particular contract and instead asserts only that the Board was in breach of "its contract with Mr. Rosin" when it violated his due process rights.  Compl. ¶ 209.  In particular, Rosin nowhere describes any employment contract he had with the Board or any of the terms of such a contract.  Although Rosin references the implied covenant of good faith and fair dealing in the Opposition, that doctrine applies only when there is an actual contract between the parties. *See E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 182, 184 (4th Cir. 2000) (holding that Maryland law recognizes an implied covenant of good faith and fair dealing in all negotiated contracts, but that the implied covenant imposes no "new obligations about which the contract is silent" because "[a]n implied duty is simply a recognition of conditions inherent in expressed promises").  Where the Complaint does not even allege facts showing that there was a contract between Rosin and the Board, the breach of contract cause of action fails to state a claim.

However, in the wake of this Court's decision in the related case of *Rorie v. Board of Education of Charles County*, No. TDC-20-3173, in which the Court dismissed Rorie's breach of contract claim based on the October 29, 2019 Incident which was virtually identical to Rosin's

19

breach of contract claim, Rosin filed on September 28, 2021 an excerpt from the Charles County Public Schools Employee Manual ("Employee Manual"), apparently in an effort to identify a governing contract between Rosin and the Board. On a Motion to Dismiss, a Court may consider an exhibit to a Motion only where those exhibits "are integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Here, however, Rosin's Complaint nowhere references the Employee Manual, nor is the Employee Manual cited as the basis for the breach of contract claim. Thus, to consider the Employee Manual would, in essence, permit Rosin to amend his Complaint through his Motion to Dismiss briefing, which, as noted above, he cannot do. *See Mylan Labs,* 770 F. Supp. at 1068.

Regardless, while Maryland courts have in some instances recognized a breach of contract action for failure of an employer to adhere to policies set forth in an employee handbook, *see Staggs v. Blue Cross of Md., Inc.*, 486 A.2d 798, 803 (Md. Ct. Spec. App. 1985), the relevant "contractual undertakings" are defined by the "required procedure[s]" set forth in the relevant handbook. *Id.* Here, the excerpt that Rosin has provided, which consists of a table of contents, a welcome letter from Superintendent Hill, an overview of how applicants are selected, and a general statement that CCPS is an equal opportunity employer, contains no procedures relating to discipline, reassignment, demotion, or termination. Thus, even if the filing of the exhibit were procedurally proper, the excerpt of the employee handbook does not outline a contractual obligation that was arguably violated in this case and that would therefore support a plausible breach of contract claim. Accordingly, Rosin's breach of contract claim in Count 7 will be dismissed. Because the Court finds that the excerpt from the Employee Manual does not alter the conclusion on the viability of Rosin's breach of contract claim, it will find Defendants' Motion to Strike that filing to be moot.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART. The Motion will be granted as to all claims with the exception of Count 3, Rosin's § 1983 due process claim against Superintendent Hill based on the Indian Head demotion. The Board and Hollstein will be dismissed as Defendants. Defendants' Motion to Strike, ECF No. 15, will be DISMISSED AS MOOT. A separate Order shall issue.

Date:  October 5, 2021

THEODORE D. CHUANG
United States District Judge

21